UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARLA S., <br><br> Plaintiff, <br><br> v. <br><br> MARTIN O'MALLEY, <br> COMMISSIONER OF SOCIAL SECURITY,[1] <br><br> Defendant. | No. 20 CV 3755 <br><br> Magistrate Judge McShain |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Carla S. brings this action for judicial review of the Social Security Administration's (SSA) decision denying her application for benefits. For the following reasons, plaintiff's request to reverse and remand the SSA's decision [20][2] is granted, defendant's motion for summary judgment [24] is denied, and this case is remanded to the agency for further administrative proceedings. 42 U.S.C. § 405(g).

## Background

### A. Procedural Background

On or around December 13, 2013,[3] plaintiff filed a Title II application for a period of disability and disability insurance benefits. [17-1] 209–12. On or around January 10, 2014, plaintiff filed a Title XVI application for supplemental security income. [*Id.*] 213–18. In both applications, plaintiff alleged a disability onset date of

---

[1] Martin J. O'Malley was sworn in as the Commissioner of Social Security Administration on December 20, 2023.
[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except for citations to the administrative record [17-1, 17-2], which refer to the page numbers in the bottom right corner of each page.
[3] Plaintiff states that she filed her applications on January 10, 2014. [20] 1 (citing [17-1] 209–18). The Commissioner states that plaintiff filed for disability insurance benefits and supplemental security income in December 2013. [24] 2. *See also* [*id.*] 11, 23 (ALJ's 2016 decision stating that both applications were filed December 13, 2013). The cited records are dated January 10, 2014, [17-1] 209–18, but they state that plaintiff completed the application for benefits under Title II on December 16, 2023, [*id.*] 209, and applied for benefits under Title XVI on January 10, 2014, [*id.*] 13. Any discrepancy is not relevant to the Court's review.

June 18, 2011,[4] [*id.*] 11, 213, 595, based on her fibromyalgia, chronic depression, obesity, and hypertension. [*Id.*] 244. The agency denied plaintiff's applications initially and on reconsideration. [*Id.*] 146–55.

On November 10, 2014, plaintiff requested a hearing, [*id.*] 159, which was held before an administrative law judge (ALJ) on April 7, 2016. [*Id.*] 11, 36–76. In a decision dated June 20, 2016, the ALJ found that plaintiff was not disabled and denied her applications. [*Id.*] 23. After the Appeals Council upheld the ALJ's decision, plaintiff filed a complaint for judicial review of the agency's decision. [*Id.*] 725–26. On February 26, 2018, Magistrate Judge Schenkier reversed the Commissioner's decision and remanded for further administrative proceedings consistent with the parties' joint stipulation for a new hearing and decision. [*Id.*] 581, 758–60.

On May 16, 2018, the Appeals Council remanded to the ALJ with instructions to reevaluate the opinions of the state agency consultants and to give further consideration to claimant's RFC or, more specifically, to "explain why a prior opinion limiting claimant to 1–3 step tasks was not given weight and to provide an evidentiary basis for the leg elevation limitation found in the" June 20, 2016 decision. [*Id.*] 581, 595, 792–97. A hearing was held before the same ALJ on October 26, 2018. [*Id.*] 595, 622–54. In a decision dated January 2, 2019, the ALJ addressed these issues and found that plaintiff was not disabled, as defined by the Social Security Act, from June 18, 2011 through the date of the decision. [*Id.*] 595–612.

The Appeals Council denied review on April 29, 2020, rendering the ALJ's decision the final decision of the Commissioner. [*Id.*] 581–85. *See* 20 C.F.R. §§ 404.955 & 404.981; *Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021). Plaintiff timely appealed to this Court [1], and the Court has subject-matter jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).[5]

**B.   The ALJ's Decision**

The ALJ reviewed plaintiff's disability claim in accordance with the SSA's five-step sequential evaluation process. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 18, 2011, the alleged onset date. [17-1] 598. At step two, the ALJ found that plaintiff has the following severe impairments: morbid obesity, fibromyalgia, and depression. [*Id.*] The ALJ found that plaintiff's hypertension and osteoarthritis of the knee and hip are non-severe

---

[4] There is also a discrepancy in this date. Plaintiff's brief states that she alleged she was disabled beginning May 18, 2011. [20] 1. Plaintiff's Title II application states she became unable to work because of her disabling condition on May 18, 2011, and her Title XVI application states her disability began on June 18, 2011. [17-1 209, 213. Both the ALJ's 2016 and 2019 decisions state that plaintiff alleged disability beginning June 18, 2011. [*Id.*] 11, 595. Again, however, the precise date is irrelevant for purposes of this appeal.
[5] The parties have consented to the exercise of jurisdiction in this case by a United States Magistrate Judge [30, 32].

2

impairments. [*Id.*] 599. At step three, the ALJ found that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [*Id.*] 599–600. Before turning to step four, the ALJ determined that plaintiff has the residual functional capacity (RFC) to perform sedentary work, except she can only occasionally use ramps and stairs; never use ladders, ropes, or scaffolds; only occasionally balance, stoop, kneel, crouch, and crawl; and have only occasional exposure to hazards, extreme temperatures, humidity, dust, fumes, and pulmonary irritants. [*Id.*] 600–11. The ALJ also limited plaintiff to simple, routine, repetitive tasks; simple work-related decisions; occasional workplace changes; and no hourly production rate pace. [*Id.*] At step four, the ALJ concluded that plaintiff is unable to perform her past relevant work as a benefits manager and a receptionist. [*Id.*] 611. At step five, the ALJ ruled that there are jobs that exist in significant numbers in the national economy that plaintiff can perform, including sorter (7,000 jobs), assembler (15,000 jobs), and packer (11,500 jobs). [*Id.*] 611–12.

## Legal Standard

To be entitled to benefits under the Social Security Act, a claimant must be "aged, blind, or disabled." 42 U.S.C. § 1382(a)(1). The Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.* at § 1382c(a)(3)(A).

In evaluating a claim for disability benefits, ALJs follow a five-step, sequential process. *Apke v. Saul*, 817 F. App'x 252, 255 (7th Cir. 2020). The ALJ must evaluate the following:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner] ...; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Fetting v. Kijakazi*, 62 F.4th 332, 336 (7th Cir. 2023) (alterations in original) (quoting *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)). *See also* 20 C.F.R. § 404.1520. "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868. The claimant bears the burden of proof at steps one through four. *Fetting*, 62 F.4th at 336 (citing *Clifford*, 227 F.3d at 868). "At step five, the burden shifts to the agency to show that 'there are significant numbers of jobs in the national

3

economy for someone with the claimant's abilities and limitations.'" *Id.* at 336–37 (quoting *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022) (citing 20 C.F.R. § 416.960(c)(2)).

When the Appeals Council denies a plaintiff's request for review, the ALJ's decision constitutes the final decision of the Commissioner. *Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021). Section 405(g) of Title 42 limits the court's review; the district court must uphold the decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (citation omitted). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). A decision denying benefits need not discuss every piece of evidence; remand is appropriate, however, when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. If conflicting evidence in the record would allow reasonable minds to disagree about whether the plaintiff is disabled, the ALJ's decision to deny the application for benefits must be affirmed if the decision is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The district court must review the entire record, including both evidence that supports the ALJ's conclusions and evidence that detracts from the ALJ's conclusions, but it may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Id.* "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, ___ U.S. ___, 139 S. Ct. 1148, 1154 (2019). Judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943)). The ALJ must follow the Social Security Administration's rulings and regulations in making a determination. Failure to do so requires reversal unless the error is harmless. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). A reviewing court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). The district court will uphold a decision so long as the record reasonably supports it and the ALJ explains her analysis of the evidence with enough detail and clarity to permit meaningful review. *Eichstadt v. Astrue*, 534 F.3d 663, 665–66 (7th Cir. 2008).

4

**Discussion**

Plaintiff argues that the ALJ's decision should be reversed and remanded for two reasons. First, plaintiff asserts that the ALJ committed legal error by failing to include all of plaintiff's necessary limitations related to concentration, persistence, and pace in plaintiff's RFC. Second, plaintiff argues that the ALJ's finding at step five of the social security analysis was not supported by substantial evidence.

A.      **Concentration, Persistence, and Pace**

Plaintiff argues that the ALJ erred in crafting the RFC by failing to "incorporate all of the restrictions stemming from" plaintiff's moderate limitations in concentration, persistence, and pace (CPP). [20] 12. According to plaintiff, the ALJ's RFC "defies" the principle established by the Seventh Circuit in *O'Connor-Spinner v. Astrue* that restrictions to simple, repetitive tasks do not account for significant problems in concentration, persistence, and pace. [*Id.*] (citing 627 F.3d 614, 620 (7th Cir. 2010)). Plaintiff asserts that *O'Connor-Spinner* also made it clear that moderate limitations in CPP are not satisfied by eliminating jobs with hourly production rates. [*Id.*] 12–13. Citing several subsequent cases, plaintiff argues that courts have repeatedly rejected the notion that a hypothetical confining a claimant to "simple, routine tasks" and limitations on end-of-day production rates adequately captures CPP deficiencies and limitations. [*Id.*] (citing *Yurt v. Colvin*, 758 F.3d 850, 858–59 (7th Cir. 2014); *Winsted v. Berryhill*, 923 F.3d 472, 476–77 (7th Cir. 2019); *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015)).

In response, the Commissioner argues that plaintiff fails to articulate what specific limitations it was necessary for the ALJ to include based on the record evidence. [24] 6. The Commissioner points to cases in which the Seventh Circuit has "repeatedly admonished claimants for this shortcoming." [*Id.*] 6–7 (citing *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019); *Dudley v. Berryhill*, 773 F. App'x 838, 842 (7th Cir. 2019); *Saunders v. Saul*, 777 F. App'x 821, 825 (7th Cir. 2019)). The Commissioner contends that without identifying additional limitations the ALJ should have included in the RFC, plaintiff fails to show prejudicial error. [*Id.*] 7. Furthermore, the Commissioner asserts that plaintiff reads cases like *O'Connor-Spinner* and *Yurt* too broadly and ignores subsequent Seventh Circuit case law clarifying the issue. [*Id.*] (citing *Urbanek v. Saul*, 796 F. App'x 910, 914 (7th Cir. 2019); *Recha v. Saul*, 843 F. App'x 1, 4 (7th Cir. 2021)). The Commissioner argues that the ALJ thus adequately accounted for plaintiff's "evidence-based limitations." [*Id.*] 8.

There is Seventh Circuit case law supporting both plaintiff's and Commissioner's positions. Some cases instruct that in crafting an RFC and posing

5

hypotheticals to the VE,[6] "the ALJ generally may not rely merely on catch-all terms like 'simple, repetitive tasks' because there is no basis to conclude that they account for problems of concentration, persistence or pace." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (quoting *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010)). *See also Bruno v. Saul*, 817 F. App'x 238, 242 (7th Cir. 2020) (citing *Crump* and noting the Seventh Circuit has often "frowned at the notion that restriction to simple tasks adequately accommodates moderate CPP limitations"). This line of cases observes that "the relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). "A task can be simple, but a person with a poor attention span may still become distracted and stop working." *Mischler v. Berryhill*, 766 F. App'x 369, 376 (7th Cir. 2019). *See also Martin*, 950 F.3d at 374 ("[S]omeone with problems concentrating may not be able to complete a task consistently over the course of a workday, no matter how simple it may be."). "The law does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work." *Martin*, 950 F.3d at 374. But "the ALJ must account for the 'totality of a claimant's limitations' in determining the proper RFC." *Id.* (citing *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018)).

The Seventh Circuit has also recognized that *Crump* teaches only that restriction to simple, repetitive tasks is "generally" not sufficient and cautions that such generic restrictions might not adequately capture a claimant's limitations. *Bruno*, 817 F. App'x at 242. There is no bright line rule that using the phrase "simple, repetitive tasks" in an RFC is automatically cause for remand. Rather, the real concern is when "the restriction is used as a one-size-fits-all solution without delving into an individualized assessment of the claimant's specific symptoms." *Id.* (citing *Martin*, 950 F.3d at 373–74). In *Bruno*, for example, the court found there was no reversible error because the record contained a specific finding that the claimant struggled to concentrate only when the assignment was complex, and a restriction to simple tasks was thus appropriate. *Id.* In *Jozefyk*, the court noted the ALJ's RFC was sufficient because it "adequately account[ed] for the claimant's demonstrated psychological symptoms." *Jozefyk v. Berryhill*, 923 F.3d 492, 497–98 (7th Cir. 2019). And in *Urbanek*, the court acknowledged that "[e]ven generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they 'adequately account for the claimant's demonstrated psychological symptoms' found in the

---

[6] The Court notes that case law similarly does not require ALJs to use "specific terms" or "magic words" in posing questions and hypotheticals to the VE, but ALJs "must ensure that the VE is 'apprised fully of the claimant's limitations' so that the VE can exclude those jobs that the claimant would be unable to perform." *Crump*, 932 F.3d at 570 (quoting *Moreno*, 882 F.3d at 730; *DeCamp v. Berryhill*, 916 F.3d 671, 675–76 (7th Cir. 2019)). Because plaintiff's criticism of the ALJ's accommodations for her moderate CPP restrictions is limited to the crafted RFC rather than the questions and hypotheticals posed to the VE, the Court need not go into further analysis on this point.

record." *Urbanek v. Saul*, 796 F. App'x 910, 914 (7th Cir. 2019) (quoting *Jozefyk*, 923 F.3d at 498).[7]

At step three, the ALJ analyzed the paragraph B criteria and found that plaintiff has a moderate limitation in concentrating, persisting, or maintaining pace. [17-1] 599–600. In support of this finding, the ALJ stated that "[t]here is evidence that claimant suffers from depression and that the symptoms of her physical impairments, including pain and muscle spasms, exacerbate her depression and cause her to lose focus." [*Id.*] 600. Later in the decision, between steps three and four, the ALJ summarized the record evidence related to plaintiff's depression in more detail:

> Medical documentation regarding claimant's depression dates back to July 2012. (Exhibit 1F) During treatment for chronic pain at Woodlawn Adult Healthcare clinic, it was noted that claimant had depression that was not well controlled. (Exhibit 1F) In December 2013, while seeking treatment for pain at Cottage View Health Center, claimant reported feeling down, depressed, and hopeless nearly every day and nervous, anxious, and on edge several days in the previous two weeks. (Exhibit 4F/15–18) That was the point at which a trial of Cymbalta was recommended. In January 2014, claimant reported that her depression had improved but that she had stopped using Cymbalta due to sleep disturbance and suicidal ideation. (Exhibit 4F/11)

[*Id.*] 606 (citing [17-1] 350–60, 442, 446–49). The ALJ concluded that the objective record failed to demonstrate a need for limitations beyond those found by the ALJ in assessing the paragraph B criteria, including only a moderate limitation in CPP. [*Id.*]

The ALJ then turned to a March 26, 2014 consultative examination performed by psychologist Robert Prescott, Ph.D., summarizing plaintiff's reported symptoms and the results of the mental status exam. [17-1] 606–07 (citing [17-1] 465–70) The ALJ noted Dr. Prescott's observations that plaintiff was oriented to time, place, and person; demonstrated good abstract thinking ability; was able to perform simple arithmetic and serial three calculations without error; and demonstrated good memory by, for example, recalling six digits forward and five digits reversed, but recalling only two of five words after five minutes. [*Id.*] 607 (citing [17-1] 465–70). The ALJ summarized Dr. Prescott's conclusions that "generally, the claimant's cognitive processes seemed to be intact, although a little less developed than expected given her education and work history." [*Id.*] (citing [17-1] 465–70). Dr. Prescott's diagnostic impression was major depression and generalized anxiety disorder. [*Id.*] (citing [17-1] 465–70).

---

[7] *See also Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021); *Pytlewski v. Saul*, 791 F. App'x 611, 616 (7th Cir. 2019); *Dudley v. Berryhill*, 773 F. App'x 838, 842 (7th Cir. 2019); *Saunders v. Saul*, 777 F. App'x 821, 825 (7th Cir. 2019).

7

Following this consultative exam with Dr. Prescott, the ALJ noted that plaintiff eventually underwent psychiatric treatment through Mercy Medical Center, beginning with an initial evaluation conducted by Dr. Wang in November 2014. [17-1] 607 (citing [17-1] 533). During this exam, Dr. Wang found plaintiff "to have fair attention and concentration, normal speech, a full and appropriate affect, and a depressed anxious mood." [*Id.*] (citing [17-1] 533). Dr. Wang also found that plaintiff's thought process was organized and logical, with no loose associations or flight of ideation; that plaintiff demonstrated poor-to-fair insight and judgment; and that plaintiff had intact memory and average intellect. [*Id.*] (citing [17-1] 533). Dr. Wang reported a diagnosis of major depressive disorder. [*Id.*] (citing [17-1] 533).

Next, the ALJ discussed plaintiff's treatment throughout 2015, 2016, and 2017, during which plaintiff attended periodic follow-up appointments at Mercy Medical with Dr. Robert Channon and several counseling appointments with Mark Hatfield. [17-1] 607 (citing [17-1] 496–511, 512–48; [17-2] 1036–58, 1198–1312). The ALJ observed that notes from Dr. Channon's February 2015 mental status exam indicated that plaintiff had a depressed mood, but that results of the exam were otherwise unremarkable. [*Id.*] (citing [17-1] 524). For example, Dr. Channon's exam included findings that plaintiff's thought processes were relevant and her associations were intact; that plaintiff was alert, oriented, and cooperative; and that she demonstrated average attention and concentration. [*Id.*] (citing [17-1] 524). The ALJ noted that subsequent mental status examinations conducted by Dr. Channon up through 2017 reflected similar findings. [*Id.*] (citing [17-1] 496–511, 512–48; [17-2] 1198–1312). The ALJ also summarized the results of a consultative psychiatric examination that plaintiff underwent in September 2017 with Dr. Ana Gil, the findings of which were largely unremarkable. [*Id.*] 607–08 (citing [17-2] 1161–64).

Upon summarizing the record evidence, the ALJ emphasized "that Dr. Prescott's examination in March 2014 revealed that the claimant demonstrated good memory, was able to perform simple arithmetic, and demonstrated good abstract thinking ability." [17-1] 608 (citing [17-1] 465–70). The ALJ found it notable that "Dr. Prescott concluded that generally, claimant's cognitive processes seemed to be intact, although a little less developed than expected given her education and work history." [*Id.*] The ALJ also highlighted "the mental status exam findings from Dr. Channon, which were unremarkable apart from claimant's depressed mood," and found it "of note" that "Dr. Channon found claimant to have normal concentration and attention." [*Id.*] (citing [17-1] 524). Finally, the ALJ acknowledged plaintiff's reported activities, including "visiting the theater with friends, previously working part-time as a theater director, and now working part-time as a playwriting instructor in the Juvenile Justice Center." [*Id.*] The ALJ observed that, "[n]otably," both of these "jobs would require a reasonably high degree of mental and physical ability and endurance." [*Id.*]

The ALJ also relied on the opinions of the state agency consultants, finding them persuasive to a certain extent. [17-1] 609 (citing [17-1] 81, 94, 113, 132). As the

8

ALJ noted, the state agency consultants at both the initial and reconsideration levels assessed plaintiff's CPP limitations and found in all areas that plaintiff was either moderately limited or not significantly limited. [*Id.*] 86, 99, 119–20, 138–39. The state agency consultants both opined that plaintiff had only "moderate" difficulties in maintaining concentration, persistence, or pace. [*Id.*] 81, 94, 113, 132. The ALJ found these broad assessments "generally consistent with claimant's longitudinal history of depression and with" the ALJ's findings as to the paragraph B criteria. [*Id.*] 609. At the initial level, the state agency consultant concluded that "[t]he medical evidence indicate[d] that the claimant's attention, concentration and persistence would be adequate for completing routine repetitive semi-skilled tasks at a consistent pace over a regular 40-hour workweek . . . ." [*Id.*] 86, 99. But as the ALJ pointed out, at the reconsideration level, the state agency consultant added that the medical evidence indicated "that the claimant's attention, concentration and persistence would be adequate for completing routine repetitive tasks involving at least 1–3 step tasks at a consistent pace over a regular 40 hour workweek . . . ." [*Id.*] 120, 139. Specifically, "[b]ased on the claimant's feelings of depression and complaints of 'brain fog' from elements of the depression itself, medications and the fibromyalgia cerebral associated effects," the state agency consultant opined that plaintiff should be "limited to simple 1–3 step tasks not requiring tight quotas and timelines." [*Id.*] 121, 140. The ALJ found that these proposed limitations were "overly restrictive and not warranted by the objective evidence" for the following reasons:

> Of note, Dr. Channon, during mental status examinations, repeatedly found claimant to have average concentration and attention. (Exhibit 11F/13; 16F/4, 7, 17, 23) Furthermore, claimant testified that since the alleged date of onset, she has been directing plays and teaching two-hour playwriting classes to juveniles, both of which entail significant complexity and require a high level of concentration. She also testified that she is able to do research on line [sic], and use social media. Her function report indicated that she can follow written instructions and handle her financial affairs (28E).

[*Id.*] 609–10. For these reasons, the ALJ concluded that a limitation to simple 1–3 step tasks was inconsistent with the reports, mental status exams, and employment history. [*Id.*] 610. However, "[o]ut of an abundance of caution," the ALJ did include "some mental limitations, including no hourly production rate pace, to account for the periodic impact of claimant's depression." [*Id.*]

Based on the objective evidence, plaintiff's subjective reports, mental examination findings, and opinion evidence, the ALJ purported to account for plaintiff's moderate limitation in CPP by limiting plaintiff "to simple, routine, repetitive tasks, simple work-related decisions, occasional workplace changes, and no hourly production rate pace." [17-1] 600. The ALJ explained why she did not find the state agency consultant's additional limitations persuasive and plaintiff does not

9

argue that the ALJ erred in considering the medical opinion evidence in the record.[8] The Court finds that the ALJ's RFC was supported by substantial evidence. Substantial evidence "means nothing more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), and for the reasons outlined, the ALJ's decision built a logical bridge from the evidence to the conclusion. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). "Even if reasonable minds could differ on the weight the ALJ gave to" evidence in the record, the court cannot "substitute [its] judgment for that of the ALJ's by reweighing the evidence." *Karr*, 989 F.3d at 513 (citing *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020)).

The Commissioner is correct that the Seventh Circuit criticizes claimants for arguing an RFC is insufficient but failing to suggest additional restrictions. *See, e.g.*, *Jozefyk*, 923 F.3d at 498 ("It is unclear what kinds of work restrictions might address Jozefyk's limitations in concentration, persistence, or pace because he hypothesizes none."); *Kuykendoll v. Saul*, 801 F. App'x 433, 438 (7th Cir. 2020) ("Notably, Kuykendoll posits no relevant limitations in concentration, persistence, or pace that the ALJ should have included in his RFC assessment."). However, the Court does not agree that the plaintiff here failed to identify what additional limitations the ALJ should have included in the RFC. Specifically, plaintiff argues that the ALJ erred in concluding that "further time off beyond normal breaks [was] not supported by the evidence" and indicates that remand is required based on the ALJ's failure to consider plaintiff's need for frequent breaks and the time she would be off task as a result of her depression and pain. [20] 13–14 (quoting [17-1] 610). *See also* [28] 3 (plaintiff's reply brief clarifying her argument that the ALJ "needed to include time-off-task" in crafting the RFC limitations).

Plaintiff asserts that the ALJ failed to acknowledge that plaintiff was only able to function in a limited, part-time setting because she was able to take time off beyond normal breaks and be absent "well beyond the accepted norm." [20] 13. In support, plaintiff points to her April 2016 hearing testimony that as a part-time theater director, she had to take frequent breaks and the assistant director had to take over if she needed to leave early. [*Id.*] (citing [17-1] 44–45).[9] From her October 2018 hearing testimony, plaintiff highlights that her role as a writing class instructor, which was only ten hours a week, similarly required her to take frequent breaks and

---

[8] "An ALJ has 'final responsibility' for determining a claimant's residual functional capacity and need not adopt any one doctor's opinion." *Fanta v. Saul*, 848 F. App'x 655, 658 (7th Cir. 2021) (citing 20 C.F.R. §404.1527(d)(2); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)). "[A]n ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." *Schmidt*, 496 F.3d at 845 (citing *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995)).

[9] Plaintiff also refers to her testimony that in this role, she "directed from the seats where she was able to elevate her legs," which the Court notes is not very persuasive in a discussion of what additional restrictions the ALJ should have included to account for plaintiff's limitations in the mental area of concentration, persistence, and pace. [20] (citing [17-1] 53–65).

that the research she conducted at home "allowed her to stop and start as her focus and concentration waxed and waned." [*Id.*] (citing [17-1] 627). According to plaintiff, the ALJ "needed to consider the time [p]laintiff would be off-task as a result of the depression and pain" the ALJ recognized would cause moderate limitations in CPP. [*Id.*] 13–14. Plaintiff argues that the ALJ's failure to do so requires remand. [*Id.*] 14.

Plaintiff does not point to any objective medical evidence or physician opinions in the record demonstrating that she requires time off beyond normal breaks and absences. Rather, plaintiff only highlights her own testimony and subjective symptoms. "Although a claimant can establish the severity of h[er] symptoms by h[er] own testimony, h[er] subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted). The ALJ found that plaintiff's subjective symptom allegations were not supported by the objective medical evidence in the record, including "largely unremarkable mental status exam findings." [17-1] 606–08, 609. As summarized above, the ALJ's decision included a lengthy summary of plaintiff's medical records as to her depression and concluded that "to the extent that claimant's longitudinal treatment history for depression requires additional mental limitations, the objective record fail[ed] to demonstrate the need for limitations beyond those" the ALJ included in the RFC. [*Id.*] 606. The ALJ also found that plaintiff's subjective allegations were "further contradicted by her employment, which demonstrate[d] that both her physical and mental capacities are often greater than" the limitations imposed by the RFC: "Indeed, claimant testified that she provides four hours of classroom instruction on the subject of playwriting to a small group of juveniles each week, and spends another six paid hours each week performing internet research and finding musical and literary content for her students to facilitate their composition of a musical." [*Id.*] 608.[10]

Furthermore, the ALJ did not ignore the testimony that plaintiff emphasizes. In her decision, the ALJ acknowledged plaintiff's testimony at the April 2016 hearing that plaintiff was "able to perform her theater job because she [could] set the schedule for herself, and if not feeling well, [could] leave the job." [17-1] 601. The ALJ also noted plaintiff's testimony at the October 2018 hearing that "she can pay attention to class preparation work for 30–45 minutes before getting distracted" and that "her physical conditions sometimes cause her to miss work, and estimated missing 15 days since starting teaching a year earlier." [*Id.*] 602. And the ALJ acknowledged plaintiff's statements in her function reports that her depression makes it "near impossible to keep a work schedule" and "her medications cause drowsiness or dizziness that prevent her from keeping a working schedule." [*Id.*] 601 (citing [17-1] 251–52). But ultimately, "an ALJ need only include limitations that are supported by the medical record." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022). "An ALJ has 'final

---

[10] The Court notes that although plaintiff's criticism involves pointing to her subjective complaints and testimony, plaintiff did not specifically invoke or provide a fully developed argument on the ALJ's subjective symptom analysis under SSR 16-3p.

11

responsibility' for determining a claimant's residual functional capacity," *Fanta v. Saul*, 848 F. App'x 655, 658 (7th Cir. 2021), and even if the plaintiff's testimony had permitted the ALJ to impose greater limitations, "there is nothing that compels them." *Delong v. Saul*, 844 F. App'x 894, 900 (7th Cir. 2021).

It is true that, as plaintiff points out, the VE testified at the October 2018 hearing that there would not be any work an individual could perform if he or she needed to be off task fifteen percent of a work day because of pain. [20] 13, [28] 3 (citing [17-1] 651). Yet plaintiff does not point to any medical records or opinion evidence demonstrating that plaintiff will be off task for fifteen percent or more of a work day, or otherwise imposing any additional limitations that the ALJ failed to consider. Plaintiff's reply brief stresses that the ALJ acknowledged that evidence demonstrates plaintiff "experiences pain and muscle spasms that '*exacerbate her depression and cause her to lose focus*.'" [28] 2 (emphasis in original) (quoting [17-1] 600). Plaintiff insists that "[w]hen a worker loses focus she is not 'on-task.'" [*Id.*] 3. But nowhere did the ALJ's decision or the record evidence indicate that this loss of focus translated to plaintiff being off task for fifteen percent or more of the workday.

Finally, Plaintiff asserts that the ALJ merely stated "in conclusory fashion" that "further time off beyond normal breaks is not supported by the evidence." [20] 13 (citing [17-1] 610). However, the ALJ made this specific observation in respect to her consideration of plaintiff's pre- and post-hearing memoranda, *i.e.*, the argument that the ALJ should have found that plaintiff had a "marked" limitation in activities of daily living and in CPP and that plaintiff required an impermissible amount of time off work, both in terms of breaks and absences. *See* [17-1] 610 (citing [17-2] 1010–14, 1019–21).[11] There is nothing in these memoranda that the ALJ did not consider, nor is there any evidence compelling the ALJ to include a limitation in the RFC for further time off task beyond normal breaks. Nevertheless, any bare assertion by plaintiff that this finding was "not supported by the evidence," [20] 13, is without merit. Plaintiff relies only on her own testimony and her argument boils down to a disagreement with how the ALJ considered and weighed the evidence in the record. As a reviewing court, this court cannot "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Burmester*, 920 F.3d at 510 (quoting *Lopez*, 336 F.3d at 539).

---

[11] Plaintiff's pre-hearing memorandum argued that plaintiff has marked limitations in activities of daily living and CPP. [17-2] 1014. It also argued that plaintiff is "unable to sustain full-time work . . . without an impermissible number and length of rest breaks" and "would be absent from the workplace in excess of what is tolerated in a competitive work setting." [*Id.*] Plaintiff's post-hearing brief included a footnote stating that her "depressive disorder meets the requirements of Listing 12.04" and establishes marked to extreme limitations in CPP and adapting or managing oneself. [17-2] 1020 n.1. The post-hearing brief also argued that plaintiff "would be off-task in excess of what is permitted and she would also be absent from the work-place in excess of what is tolerated." [*Id.*] 1021.

Plaintiff has not demonstrated that the ALJ's RFC assessment failed to adequately account for plaintiff's moderate limitation in concentration, persistence, and pace. Remand is not required on this ground.

B.     The ALJ's Decision at Step Five

Plaintiff argues that the ALJ's finding at step five—that there are jobs that exist in significant numbers in the national economy that plaintiff can perform—was not supported by substantial evidence. [20] 14–15. In support, plaintiff asserts that the VE's numbers upon which the ALJ relied were unreliable and not substantial enough to constitute "significant numbers" in the national economy. [*Id.*] The Commissioner argues that the ALJ reasonably relied on the VE's testimony from the October 2018 hearing to support her decision at step five and that neither of plaintiff's arguments withstands scrutiny. [24] 10–12.

At the October 2018 hearing, the ALJ posed a hypothetical to the VE involving an individual with the same age, education, and work history as plaintiff and who can perform sedentary work, but is further limited to only occasional ramps and stairs; no ladders, ropes, and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; occasional exposure to hazards; occasional exposure to extreme temperatures, humidity, dust, fumes, and pulmonary irritants; and restriction to simple, routine, repetitive tasks, simple work-related decisions, and occasional changes. [17-1] 650. The VE testified that such an individual could perform the positions of sorter, with 14,000 jobs in the national economy; assembler, with 30,000 jobs; and packer, with 23,000 jobs. [*Id.*] When the ALJ added a restriction to the hypothetical, stating that such an individual could also not meet an hourly production rate pace, the VE testified that that individual could still perform the sorter, assembler, and packer positions, but the numbers of available jobs in the national economy would be reduced by fifty percent. [*Id.*] As the ALJ crafted an RFC for plaintiff that included this final restriction, the ALJ relied on the reduced/halved numbers: 7,000 sorter jobs, 15,000 assembler jobs, and 11,500 packer jobs. [*Id.*] 612. Plaintiff's attorney questioned the VE at the hearing, which included asking the VE questions about the numbers the VE provided. [*Id.*] 652–53.

First, plaintiff criticizes the VE's methodology in calculating the numbers of jobs that exist in the national economy for the positions of sorter, assembler, and packer.[12] [20] 14. *See* [17-1] 611–12 (ALJ's opinion), 650 (hearing transcript). Plaintiff asserts that according to *Chavez v. Berryhill*, 895 F.3d 962 (7th Cir. 2018), the "equal distribution method" employed by the VE is "highly unreliable" and "cannot provide substantial evidence upon which the ALJ can deny benefits to a disabled individual."

---

[12] Plaintiff's counsel had no objections about VE Seaver testifying as a vocational expert, [17-1] 648, and the VE's "qualifications are not at issue here." *Chavez*, 895 F.3d at 964. But "a claimant need not object to an expert's *qualifications* in order to object to the expert's *methodology*. *Brace v. Saul*, 970 F.3d 818, 823 (7th Cir. 2020) (emphases in original) (citing *Chavez*, 895 F.3d at 964).

13

[20] 14–15. In response, the Commissioner asserts that this methodology is not erroneous and points to a case from this district observing that "the Seventh Circuit has not precluded VEs from using the equal distribution method." [24] 10 (quoting *Matthew G.T. v. Saul*, No. 19 C 1486, 2020 WL 6940981, at *12 (N.D. Ill. Nov. 25, 2020)). The Commissioner also argues that after the VE confirmed the methodology she used at the hearing, plaintiff failed to "challenge the methodology or ask any follow-up questions." [*Id.*] at 10–11 (collecting cases). According to the Commissioner, plaintiff did not "contest the VE's job-number estimates" or "cross-examine the VE to determine how a different methodology . . . might affect h[er] analysis" and the ALJ therefore "had no reason to examine the VE about different methodologies or to seek a more detailed explanation." [*Id.*] (quoting *Keyosha L. v. Saul*, No. 19 CV 1843, 2020 WL 5076685, at *6 (N.D. Ill. Aug. 26, 2020)). Referring to the questions plaintiff's counsel did ask the VE, the Commissioner argues that "a confirmation is not a challenge" and that plaintiff "should not prevail on this argument when she had to opportunity to cross-examine the" VE. [*Id.*] 11–12.

The Court first addresses the Commissioner's contention that plaintiff's argument should be deemed waived because she failed to raise it at the administrative hearing. [24] 11. "When no one questions the [VE's] foundation or reasoning, an ALJ is entitled to accept the [VE's] conclusion . . . ." *Fetting*, 62 F.4th at 337 (alterations in original) (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). "Accordingly, a claimant who does not object to a VE's testimony during the administrative hearing forfeits those objections." *Id.* (citing *Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016)). Objections a claimant does make at the hearing "must be specific; to avoid forfeiture, a claimant must do more than make a general objection or vaguely ask the VE about his methodology." *Id.* at 338. The plaintiff's questioning here may fall into the latter category. *See* [17-1] 651–53 (making no formal objection and only vaguely questioning the VE about her methods). But unlike the claimant in *Fetting*, whose written filings did not challenge the VE's methodology and who failed to file post-hearing objections, plaintiff *did* file a post-hearing memorandum, which specifically raised concerns with the VE's methodology. [17-2] 1021. The Court thus continues to the merits of plaintiff's argument.

"In reviewing a VE's testimony, [courts] ask whether substantial evidence supports the ALJ's reliance on that testimony, including whether the VE used a reliable methodology." *Hohman v. Kijakazi*, 72 F.4th 248, 252 (7th Cir. 2023) (citing *Chavez*, 895 F.3d at 968). *See also Ruenger v. Kijakazi*, 23 F.4th 760, 763 (7th Cir. 2022) ("In the context of job-number estimates, substantial evidence requires the ALJ to ensure that the vocational expert's estimate is the product of a reliable methodology."). "A methodology is reliable when it is based on 'well-accepted' sources and its steps are 'cogently and thoroughly' explained." *Hohman*, 72 F.4th at 253 (quoting *Biestek*, 139 S. Ct. at 1155). In other words, the VE's "explanation of the methodology that [s]he used to produce h[er] estimate must be 'reasoned and principled' enough to instill some confidence that the estimate was not 'conjured out

14

of whole cloth.'" *Case v. Kijakazi*, 2023 WL 4882880, at *3 (7th Cir. Aug. 1, 2023) (quoting *Ruenger*, 23 F.4th at 763; *Donahue*, 279 F.3d at 446). "A 'precise count is not necessary,' but the VE's testimony 'must be supported with evidence sufficient to provide some modicum of confidence in its reliability.'" *Fetting*, 62 F.4th at 339 (quoting *Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020)).

VEs regularly "refer to job categories as listed in the Dictionary of Occupational Titles [(DOT)], a publication that regulations allow the Social Security Administration to consider." *Bruno*, 817 F. App'x at 243. *See also Sharol W. v. O'Malley*, No. 21 C 3484, 2023 WL 9000493, at *3 (N.D. Ill. Dec. 28, 2023) (citing 20 C.F.R. § 416.966(d)(1)) ("The SSA authorizes itself to 'take administrative notice of reliable job information' from the Dictionary of Occupational Titles ('DOT') and other published sources."). The *Chavez* court, however, observed the significant limitations of the DOT and stated that "[t]o determine the number of jobs, a VE must consult another resource." 895 F.3d at 965. One of these other resources that VEs commonly "use[] is the Department of Labor's compilation of Occupational Employment Statistics," which "does not use the DOT job grouping system, but instead relies upon another classification system, the Standard Occupational Classification (SOC)." *Id*. *Chavez*, and cases following that decision, have explained that "there is a mismatch between the DOT codes and Occupational Employment Survey (OES) data because they use different classification schemes." [13] *Case*, 2023 WL 4882880, at *3 (citing *Chavez*, 895 F.3d at 965–66). Accordingly, VEs "must employ some analytical method to match DOT job categories with OES data on job prevalence." *Id*. In other words, "the VE's task is to estimate the portion of jobs in an SOC category that corresponds to the particular DOT occupation the claimant can perform." *Sok v. Kijakazi*, 2022 WL 17413558, at *1 (7th Cir. Dec. 5, 2022).

Relying on *Chavez*, plaintiff argues that the VE in this case improperly used the "equal distribution method," which plaintiff asserts the Seventh Circuit has found "highly unreliable." [20] 14–15. At the October 2018 hearing, the ALJ asked the VE if the job positions and corresponding numbers in the national economy she provided were "representative" and if the VE's testimony was "consistent with the Dictionary of Occupational Titles[.]" [17-1] 650. The VE answered "yes" to both. [*Id*.] In relevant part, plaintiff's counsel and the VE then engaged in the following colloquy:

> Q. The numbers that you've given: were those for the specific jobs? Or for the . . . was it the SCO [sic] or OEC?
>
> A. Yes. So, yeah, the numbers were for the occupational group . . . which is made up of several different DOTs. So, the DOTs were an example of jobs that were in that occupational group.

---

[13] *See also Fetting*, 62 F.4th at 337; *Ruenger*, 23 F.4th at 762; *Bruno*, 817 F. App'x at 243; *Sharol W.*, 2023 WL 9000493, at *3; *James M. v. Kijakazi*, No. 20 CV 2082, 2023 WL 3652862, at *6 (N.D. Ill. May 25, 2023).

15

> Q. Okay. So, were you using, I think they call it the method of, basically just dividing into that number by the number of jobs in the group?
>
> A. Yes.

[*Id.*] 652–53. In her decision, the ALJ noted that the VE testified that the information the VE provided and that the ALJ incorporated in the decision was "consistent with the information in the Dictionary of Occupational Titles, and pursuant to SSR 00-4p," the ALJ found they were consistent. [*Id.*] 612. The ALJ's decision did not specifically address the concerns with the VE's testimony that plaintiff raised in her post-hearing memorandum. *See* [17-2] 1021. The Appeals Council's decision acknowledged this argument, but provided no substantive discussion before concluding that this contention was "without merit." [17-1] 582.

Although the Seventh Circuit has expressed "many concerns about the method's reliability," the court has also clarified that it has "never categorically barred VEs from using that method in social security disability hearings." *Hohman*, 72 F.4th at 254. *See also Coyier v. Saul*, 860 F. App'x 426, 428 (7th Cir. 2020) (noting "that *Chavez* did not enjoin the use of the equal-distribution method"); *Chavez*, 895 F.3d at 970 ("Nor is it our place to enjoin use of the equal distribution method."). "It is not, by itself, reversible error for an ALJ to rely on the equal distribution method— in its purest form or modified to reflect a VE's experience—to make a step-five job-number determination." *Hohman*, 72 F.4th at 254. *See also Leisgang v. Kijakazi*, 72 F.4th 216, 220 (7th Cir. 2023) (acknowledging that the court has "sharply criticized the equal distribution method many times before," but finding that "nothing about the VE's testimony in this case indicated, by itself, that the ALJ could not put some 'modicum of confidence' in the VE's job-number estimates").

What *is* required, however, "is more than what supported the ALJ's decision here." *Chavez*, 895 F.3d at 970. Despite using the oft-questioned equal distribution method, the VE provided no explanation or further demonstration of why her methodology was reliable. There is no indication that the VE drew on her knowledge or experience (and if so, how). With next to no explanation at all, the Court certainly cannot find that the VE explained her methodology "cogently and thoroughly." *Fetting*, 62 F.4th at 339 (quoting *Ruenger*, 23 F.4th at 763). And although the burden is on the ALJ at step five of the social security analysis, the ALJ did not ask any questions further probing into the VE's methodology. The ALJ's decision ignored the issue entirely. The circumstances in which other courts found a VE's methodology reliable are not present here. *See, e.g., Case*, 2023 WL 4882880, at *3 ("When questioned, the vocational expert explained that his estimates were not only the product of the [SkillTRAN] software, but also of his experience providing job counseling, his prior research, and his observations of the jobs in question.");

16

*Hohman*, 72 F.4th 253 (finding it sufficient that the VE based his estimates on his "'knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources [and] placing workers in jobs' over the course of his 25-year career"); *Fetting*, 62 F.4th at 339 (finding that the "VE's testimony was sufficiently cogent and thorough for the ALJ to rely on it by explaining "that he used the OES numbers and his thirty years of job placement experience to calculate his estimates"); *Sok*, 2022 WL 17413558, at *2 (finding that the VE's "explanation of his process—first, referencing information found in the DOT and SOC, and second, drawing on his knowledge of the labor market—was sufficient for the agency to meet its modest evidentiary burden"); *Matthew G.T.*, 2020 WL 6940981, at *12 ("Unlike in *Chavez*, the VE in this case provided a detailed explanation for her job number estimates, which she laid out in a post-hearing report."). *Compare with Ruenger*, 23 F.4th at 764 ("Like the expert in *Chavez*, the expert here failed to justify her choice by, for example, drawing on her past experiences with the method or knowledge of job markets."); *James M. v. Kijakazi*, No. 20 CV 2082, 2023 WL 3652862, at *6 (N.D. Ill. May 25, 2023) (cleaned up) ("Here, however, the VE did not explicitly tie her background to her estimate of nationwide job numbers, nor did she give a reasoned explanation of how she moved from the broader SOC codes and job numbers to the more specific DOT titles (and associated job numbers) that plaintiff could perform.")

When the ALJ's decision at step five is not supported by substantial evidence, remand for further administrative proceedings is warranted and "a new step-five hearing is needed to explore the evidentiary gap in this case." *Ruenger*, 23 F.4th 764. At this hearing, the ALJ may "spend time inquiring into the expert's methodology" and the VE "may be able to expand on her testimony or make some other showing that significant jobs exist for" plaintiff. *Id.*

As a final note, plaintiff also argues that the numbers upon which the ALJ relied were not substantial enough to constitute "significant numbers" in the national economy. [20] 15. Relying solely on a case from the Northern District of Indiana, plaintiff argues that "the total number of jobs relied on by the ALJ represents only 0.0022% of jobs" because the total number of full-time jobs in the U.S. in February 2019 was 150,606,000.00 and the ALJ relied on 35,000 jobs. [*Id.*] (citing *Sally S. v. Berryhill*, No. 18-cv-460, 2019 WL 3335033 (N.D. Ind. July 23, 2019)). *See* [17-1] 612, 650 (7,000 sorter plus 15,000 assembler plus 11,500 packer jobs totaling 33,500). "Plaintiff contends that there is no context in which 35,000 [sic] jobs in the entire United States represents a significant number of jobs upon which benefits should be denied to a disabled individual." [20] 15.

As the Commissioner points out, courts in this district have found *Sally S.* unpersuasive and declined to follow it. [24] 12 (citing *Marko L. v. Saul*, No. 16 C 9723, 2021 WL 843427, at *7 (N.D. Ill. Mar. 5, 2021)) ("Seventh Circuit precedent casts doubt on the conclusion in that case."). *See Misty H. v. Kijakazi*, 2022 WL 4182390, at *7 (N.D. Ill. Sept. 13, 2022) (noting that the court in Sally S. "did not consult a

single case on the subject" and "[a]s such, the holding has little or no authoritative value"); *Altaf J. v. Kijakazi*, No. 20 CV 6010, 2022 WL 4534691, at *6 (N.D. Ill. Sept. 28, 2022) (rejecting this "minority position proposed by Claimant and supported by a single citation to a non-precedential case from another district"); *Tommie S. v. Kijakazi*, No. 19 C 8249 , 2021 WL 5232728, at *5 (N.D. Ill. Nov. 10, 2021) (stating that "the *Sally S.* case has been questioned in this district and the Court chooses not to follow it here"); *Douglas G. v. Kijakazi*, No. 19 CV 7033, 2021 WL 3849637, at *5 (N.D. Ill. Aug. 27, 2021) (citing *Chavez* and *Biestek* in noting that "the governing standard is not whether a jobs number falls above or below a set numerical value, but whether substantial evidence supports the VE's testimony that significant jobs exist"). *See also Milhem v. Kijakazi*, 52 F.4th 688, 695 (7th Cir. 2022) (noting that the *Sally S.* "decision is not binding on this court and does not account for" the Seventh Circuit's case law); *Kuhn v. Kijakazi*, No. 22-1389, 2022 WL 17546947, at *3 n.1 (7th Cir. 2022) ("For the same reasons discussed in *Milhem*, 52 F.4th at 695, we do not rely on *Sally S.*"). And as one court in this district pointed out, "the judge who authored" *Sally S.* has since "disavowed it." *Misty H.*, 2022 WL 4182390, at *7 (citing *Jennifer K. v. Kijakazi*, No. 21CV68, 2022 WL 766164, at *4 (N.D. Ind. Mar. 14, 2022) ("*Sally S.* was decided in 2019 and, quite frankly, has proven unworkable in the ensuing years. Thus, later decisions from this Court have retreated from the *Sally S.* holding.").

As the Court is already remanding the case for further proceedings as to the ALJ's decision at step five, it will not further address plaintiff's argument on this point.[14]

---

[14] However, the Court will reiterate that it is the ALJ's burden at step five and that on remand, the ALJ should clarify her position and explain why the number of national jobs she adopts based on the VE's testimony is sufficient. *See Milhem*, 52 F.4th at 696 ("In determining whether there is a 'significant' number of jobs in the national economy, the regulatory scheme gives the ALJ discretion to decide, using substantial evidence, when a number of jobs qualifies as significant.").

## Conclusion

For the forgoing reasons, plaintiff's request to remand the SSA's decision [20] is granted, defendant's motion for summary judgment [24] is denied. In accordance with sentence four of 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this order.

_____
**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: January 10, 2024**